UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
UNITED STATES OF AMERICA                    :
                                            :        03 Cr. 1197 (SHS)
          -against-                         :
                                            :            OPINION
UZAIR PARACHA                               :
                                            :
                    Defendant.              :
---------------------------------------------------------------x
SIDNEY H. STEIN, U.S. District Judge.

     Defendant Uzair Paracha is charged in a five count indictment with conspiracy and substantive charges of providing material support and resources to al Qaeda; making or receiving a contribution of funds, goods or services on behalf of al Qaeda; and committing identification document fraud with the intent of providing material support to al Qaeda in order to facilitate a terrorist act.  According to the indictment, Paracha conspired to provide support to al Qaeda by coming to the United States, posing as a person Paracha knew to be an al Qaeda associate, obtaining immigration documents that would permit the al Qaeda associate to enter the United States, conducting financial transactions involving the al Qaeda associate's bank account, and accepting up to $200,000 of al Qaeda funds to be invested in a business where Paracha was employed until the funds were needed by al Qaeda.  During the course of the trial, which concluded with the jury returning a verdict of guilty on all five counts on November 23, 2005, the parties raised a variety of legal issues, all of which were ruled on prior to or during the trial.

     Three of those issues – whether Paracha was entitled to access to prospective defense witnesses whom the government will neither confirm nor deny were in its custody; whether a proposed government expert would be allowed to testify to terrorist tradecraft; and how properly to instruct the jury on the <u>mens</u> <u>rea</u> requirement of the statute that makes it a crime to provide material support to foreign terrorist organizations – are likely to recur in the future. Accordingly,

having subjected its analysis to the crucible of writing, the Court now sets forth with greater

specificity the reasoning behind its trial determinations.

## Table of Contents

I.   Access to Witnesses .................................................................................................... 2
  A.   Factual and Procedural Background ......................................................................... 4
  B.   Access to Khalid Sheik Mohammed, Majid Khan and Ammar al Baluchi ...................... 8
    1.   The Prospective Witnesses Are Within the Court's Process Power ............................... 9
    2.   Paracha Is Entitled to Present Khan's and al Baluchi's Testimony in his Defense ...... 15
      a.   Ammar al Baluchi's anticipated testimony ............................................................. 19
      b.   Majid Khan's anticipated testimony ...................................................................... 20
      c.   Khalid Sheik Mohammad's anticipated testimony ................................................. 21
      d.   National security concerns .................................................................................. 22
      e.   Proper jury instructions for the introduction of the unclassified summaries ........... 24
  C.   Defendant Is Not Entitled to the Trial Testimony of Saifullah Paracha ......................... 27
II.   The Government's Proposed Expert ............................................................................. 31
  A.   Factual Background ............................................................................................... 32
  B.   Admissibility of Expert Testimony ........................................................................... 33
  C.   The Expert's Experience and Methodology ............................................................. 35
  D.   The Scope of Expert Testimony ............................................................................. 37
    1.   Origins, Structure and Leadership of al Qaeda ...................................................... 37
    2.   Alleged Co-Conspirators .................................................................................... 38
    3.   Al Qaeda Tradecraft: Counter-Interrogation Techniques ......................................... 40
III.   Jury Instructions on the Mens Rea Requirement for 18 U.S.C. § 2339B ......................... 42
  A.   The Statute – 18 U.S.C. § 2339B ........................................................................... 44
  B.   No Intent to Further the Illegal Activities of the Foreign Terrorist Organization Is
       Required ............................................................................................................... 45
  C.   Knowledge That What the Defendant Provides Is, In Fact, "Material Support" Is Not
       Required ............................................................................................................... 52
  D.   Instruction on the Mens Rea Requirement ............................................................... 53
IV.   Conclusion ............................................................................................................... 54

## I.   Access to Witnesses

Defendant Uzair Paracha has moved pursuant to Rule 15(a)(1) of the Federal Rules of

Criminal Procedure for pretrial depositions to preserve testimony for trial of four prospective

defense witnesses: (1) his father, Saifullah Paracha; (2) Majid Khan; (3) Ammar al Baluchi and

(4) Khalid Sheik Mohammed.  He also has petitioned for writs of habeas corpus <u>ad</u> <u>testificandum</u>

to compel the presence at trial of those four individuals.

For the reasons set forth more fully below, the Court concludes that because Paracha has not made the necessary showing of materiality of Khalid Sheik Mohammed's anticipated testimony, neither the Sixth nor the Fifth Amendment affords Paracha a right to compel Mohammed's testimony.  However, Paracha has made the necessary showing of materiality in regard to Majid Khan and Ammar al Baluchi and the Court rejects the government's contention that separation of powers principles place them beyond the Court's process power.  Paracha's constitutional right to present his defense, however, is in tension with significant national security issues presented by his request for deposition or live testimony of these witnesses. Because in this case there is an available alternative – namely, unclassified summaries of statements made by the witnesses – the government's refusal to produce Khan or al Baluchi for deposition or trial or even to confirm or deny the government's access to or custody of those individuals does not warrant dismissal of the indictment.

As is also set forth more fully below, defendant's motion for a Rule 15 deposition of his father, Saifullah Paracha, was ultimately granted, but defendant declined to proceed with that deposition and instead pressed his entitlement to a writ for Saifullah's production for testimony at the trial.  In light of the significant logistical burdens and the risk to national security that would be posed by Saifullah Paracha's transportation from the U.S. Naval Base in Guantanamo Bay, Cuba – where he is being held as an enemy combatant by the U.S. Department of Defense – and his production at trial for live testimony, and in light of the availability to the defense of the alternative of a videotaped deposition of Saifullah Paracha, defendant's request for a writ <u>ad testificandum</u> compelling Saifullah Paracha's testimony at trial is denied.

A.      **Factual and Procedural Background**

On October 8, 2003, Uzair Paracha was charged in a five count indictment with (1) conspiring to provide material support to al Qaeda in violation of 18 U.S.C. § 2339B by coming to the United States, posing as a person Paracha knew to be an al Qaeda associate, obtaining immigration documents that would permit the al Qaeda associate to enter the United States, conducting financial transactions involving that al Qaeda associate's bank account and accepting up to $200,000 of al Qaeda funds to be held as an investment in a business where Paracha was employed until the funds were needed by al Qaeda; (2) providing, or attempting to provide, material support to al Qaeda in violation of 18 U.S.C. § 2339B by knowingly taking possession of identification documents and other items in the name of a person Paracha knew to be an al Qaeda associate, and posing as that person when seeking information concerning the issuance of immigration documents that would permit the al Qaeda associate to enter the United States; (3) violating regulations issued under the International Emergency Economic Powers Act, ("IEEPA"), in violation of 50 U.S.C. § 1705(b), by conspiring to make or receive a contribution of funds, goods, or services to, and for the benefit of, al Qaeda by committing the same acts as set forth in Count One; (4) actually violating the IEEPA regulations by making or attempting to make a contribution of funds, goods or services, by taking the actions outlined in Count Two; and (5) committing identification document fraud, in violation of 18 U.S.C. § 1028(a)(7) and (b)(4), by obtaining and using another individual's means of identification with the intent to provide material support or resources to al Qaeda, in violation of 18 U.S.C. § 2339B, and doing so in order to facilitate an act of international terrorism.

In January 2004, Paracha filed an omnibus pretrial motion seeking, inter alia, depositions pursuant to Rule 15 of the Federal Rules of Criminal Procedure of three prospective defense

witnesses: Majid Khan, Khalid Sheik Mohammed and defendant's father, Saifullah Paracha. Rule 15 authorizes a party to move for the deposition of a prospective witness "in order to preserve testimony for trial" and authorizes a court to grant that motion "because of exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a). Exceptional circumstances generally exist if the testimony is material and the witness is unavailable. See United States v. Johnpoll, 739 F.2d 702, 709 (2d Cir. 1984); see also United States v. Grossman, No. S2 03 Cr. 1156, 2005 WL 486735, at *2 (S.D.N.Y. Mar. 2, 2005) (quoting United States v. Cohen, 260 F.3d 68, 78 (2d Cir. 2001)). Paracha asserted on information and belief that the three individuals were unavailable for trial because they were being held in the custody of the United States government in Afghanistan. (See Def's Mem. of Law in Support of Pretrial Motions, at 21).

On November 15, 2004, the Court denied that motion on the ground that Paracha had failed to establish that the witnesses were likely to provide material testimony. (Tr. of Nov. 15, 2004 Conf. at 11). The government did acknowledge that Saifullah Paracha was being held in the custody of the U.S. Department of Defense at the U.S. Naval Base in Guantanamo Bay, Cuba and subsequently disclosed statements made by him during a hearing before the Combatant Status Review Tribunal at Guantanamo Bay. Certain of those statements tended to exculpate Uzair Paracha from involvement in the charged crimes. Following the release of those statements to defendant, Paracha moved for reconsideration of the denial of his Rule 15 motion.

In response to Paracha's motion, the government – appropriately – conceded that the declassified materials demonstrated the materiality of Saifullah Paracha's testimony to the defense of this action. (Tr. of Feb. 15, 2005 Conf. at p. 3-5). Thereafter, the parties reached agreement regarding procedures for a deposition of Saifullah Paracha at Guantanamo Bay and this Court ordered that a Rule 15 deposition of Saifullah be taken in accordance with those

procedures.  (Stipulation and Order, dated May 20, 2005).  Four months later, by letter dated

September 16, 2005, Paracha's counsel informed the government that the defense had decided

not to depose Saifullah Paracha, (see Letter from Edward D. Wilford to Karl Metzner, dated

Sept. 16, 2005), despite the fact that a deposition had been scheduled to take place twelve days

later. (See Letter from Karl Metzner to the Court, dated September 19, 2005, at 1).  After

declining to take the Court sanctioned Rule 15 deposition of Saifullah Paracha, the defendant

sought the issuance of a writ ad testificandum directing the government to produce Saifullah

Paracha to testify at trial.

 After the release of Saifullah's statements to the Combatant Status Review Tribunal,

Paracha had also renewed his motion to depose Majid Khan and Khalid Sheik Mohammed, but

asserted that his ability to demonstrate the materiality of their testimony continued to be hindered

by his lack of access to those individuals or any statements attributed to them.  The government

indicated that an additional review of information in its possession was warranted to ensure that

all exculpatory materials regarding Khan and Mohammed were disclosed; resolution of

defendant's motion for access to Khan and Mohammed was deferred until the government

completed that review.  (Tr. of Feb. 15, 2005 Conf. at 7-8, 11-12).

 On June 13, 2005, the government filed, ex parte and under seal, a Motion for a

Protective Order Pursuant to Section 4 of the Classified Information Procedures Act, 18 U.S.C.

App. 3, § 4, and Rule 16 of the Federal Rules of Criminal Procedure, seeking an order from the

Court authorizing disclosure of unclassified summaries of certain classified documents, in lieu of

disclosure of the classified documents themselves, in connection with the government's

disclosure obligations pursuant to Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d

215 (1963).

A week later, the government, appearing ex parte, provided the Court with the underlying classified materials for the Court's review. The Court reviewed those materials, asked for and received clarification regarding certain information and identified certain additional information that the government was required to include in the unclassified summaries to satisfy the government's Brady obligations. (Order, dated July 8, 2005). Pursuant to the Court's Order dated July 8, 2005, the government disclosed the unclassified summaries with the additions required by the Court to the defense. Those unclassified summaries consisted of statements attributed to three individuals: (1) Majid Khan; (2) an individual known to defendant as "Mustafa" who has subsequently been identified as Ammar al Baluchi and (3) an individual known to defendant as "Uzair," who has subsequently been identified as Khalid Sheik Mohammed.

Based on these summaries, the defense again moved pursuant to Fed. R. Crim. P. 15(a)(1) for access to Majid Khan and Khalid Sheik Mohammed for the purpose of securing and preserving their testimony for trial and for the first time also sought permission to depose Ammar al Baluchi. The government continued to oppose the request for access to Mohammed on grounds that his testimony would not be material to the defense and opposed the request for access to Khan or al Baluchi on national security grounds. In light of the conceded materiality of Khan and al Baluchi's testimony, however, the government proposed that the crafting of some substitution for their live testimony was warranted.

The Court first addresses Paracha's request for access to Mohammed, Khan and al Baluchi and then turns to the request for the trial writ for Saifullah Paracha.

**B.       Access to Khalid Sheik Mohammed, Majid Khan and Ammar al Baluchi**

Three of the witnesses to whom Paracha seeks access – Khalid Sheik Mohammed, Majid Khan and Ammar al Baluchi – are presumed to be al Qaeda associates (see Unclassified Summaries, Ex. A to Def's Notice of Mot. to Compel Rule 15 Depositions of Certain Individuals & for Bail, "Unclassified Summaries") and are asserted by Paracha to be held in the custody of the United States government in undisclosed locations abroad in connection with the conflict against al Qaeda.   Although the government takes the position that national security concerns prohibit it from confirming or denying that it has access to, or custody of, any of these three individuals, it agrees that solely for the purposes of this motion they may be presumed to be held in the custody of the United States abroad.  (See Govt's Mem. in Opp. to Paracha's Pretrial Mots., at 15).   Paracha asserts a right to compel the production of these individuals to testify in his defense at trial pursuant to the Sixth Amendment's Compulsory Process clause and the Fifth Amendment's Due Process clause.  The government insists that even assuming that the individuals are in United States custody, separation of powers principles place them outside the Court's compulsory process power, and thus the Sixth Amendment affords Paracha no right of access to those individuals.  The government concedes, however, that the Fifth Amendment may entitle defendant the right to present their testimony in some form. The questions the Court must resolve are (1) whether the individuals are within this Court's compulsory process power; (2) whether Paracha is entitled to an order compelling their production at trial or permitting access for a Rule 15 deposition; and (3) whether some alternative means of presenting the witnesses' testimony to the jury will satisfy Paracha's Sixth and Fifth Amendment rights.  The Court addresses each question in turn.

### 1.      The Prospective Witnesses Are Within the Court's Process Power

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor."  U.S. Const. amend. VI.  The United States Supreme Court has recognized that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense," noting that "[i]ndeed, this right is an essential attribute of the adversary system itself."  Taylor v. Illinois, 484 U.S. 400, 408, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988).  "'At a minimum,'" the Sixth Amendment encompasses the right of "'criminal defendants . . . to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt.'"  Id. (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 56, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987)).

The Sixth Amendment affords a right to compulsory process, however, "only where it is within the power of the federal government to provide it."  United States v. Greco, 298 F.2d 247, 251 (2d Cir. 1962).  Although the subpoena power of the Court – the power generally invoked to compel the presence of witnesses at trial pursuant to Fed. R. Crim. P. 17(b) – does not extend to foreign nationals outside the United States, see United States v. Zabaneh, 837 F.2d 1249, 1259-60 (5th Cir.1988); see also United States v. Herbert, No. 03 Cr. 211, 2005 WL 106909, *1 (S.D.N.Y. Jan. 19, 2005), when a prospective witness is held in custody – as each of the prospective witnesses here is presumed to be only for purposes of this argument – the proper procedure is for the defendant to seek the issuance of a writ ad testificandum.  See 28 U.S.C. § 2241(c)(5) ("[t]he writ of habeas corpus shall not extend to a prisoner unless . . . [i]t is necessary to bring him into court to testify or for trial"); United States v. Cruz-Jiminez, 977 F.2d 95, 99-100 (3rd Cir. 1992); United States v. Gotti, 784 F.Supp. 1011, 1012-13 (E.D.N.Y. 1992).  The

9

proper analysis in this case is not whether the Court can reach the witness through its subpoena power, but whether the Court has the power to issue a writ of habeas corpus ad testificandum to the witnesses' custodian.  United States v. Moussaoui, 382 F.3d 453, 464 (4th Cir. 2004), cert. denied, 125 S. Ct. 1670, 161 L. Ed. 2d 496 (Mar. 21, 2005).

Ordinarily, a habeas writ must be served on a prisoner's immediate custodian.  However, where, as here, the immediate custodian is unknown, a writ may properly be served on the prisoner's ultimate custodian.  See Demjanjuk v. Meese, 784 F.2d 1114, 1116 (D.C. Cir. 1986) (cited in Rumsfeld v. Padilla, 542 U.S. 426, 450, n. 18, 124 S. Ct. 2711, 159 L. Ed. 2d 513 (2004)); see also Moussaoui, 382 F.3d at 465.  Here, as in Moussaoui, the Court assumes for the purposes of the motion that the three prospective witnesses are within the custody of the United States military; in such a case, the witnesses' ultimate custodian, the Secretary of Defense, would be "indisputably within the process power" of this Court and "thus a proper recipient of a testimonial writ directing production of the witnesses."  See Moussaoui, 382 F.3d at 465. Moreover, even if it were necessary to serve the writ on an immediate custodian, the assumption that the witnesses are held abroad does not place them beyond this Court's compulsory process power because – as several courts have recognized – testimonial writs can be issued extraterritorially.  See Moussaoui, 382 F.3d at 465-66; (citing Carbo v. United States, 364 U.S. 611, 81 S. Ct. 338, 5 L. Ed. 2d 329 (1961) and Muhammad v. Warden, 849 F.2d 107, 114 (4th Cir. 1988) (explaining why the Supreme Court's historical and statutory analysis in Carbo addressing the extraterritorial application of the writ ad prosequendum applies with equal force to the writ ad testificandum)).

The government contends that separation of powers considerations nonetheless place Mohammed, Khan and al Baluchi beyond this Court's compulsory process powers because any

order compelling the production of the witnesses held in connection with the conflict against al

Qaeda would impermissibly intrude upon the political branches' exercise of war-making and

foreign-relations powers.  The government relies primarily upon the Supreme Court's decision in

Johnson v. Eisentrager, 339 U.S. 763, 70 S. Ct. 936, 94 L. Ed. 1255 (1950), to support its

contention that federal courts lack authority to order a deposition of individuals presumed to be

detained as enemy combatants abroad.  Such an order, it asserts, would allow terrorists on trial to

manufacture a "conflict between judicial and military opinion highly comforting to the enemies

of the United States."  Eisentrager, 339 U.S. at 779.  The government also relies upon the

decision issued by the United States Court of Appeals for the Fourth Circuit in Hamdi v.

Rumsfeld, 316 F.3d 450, 470 (4th Cir. 2003), vacated, 542 U.S. 507 (2004).

The government insists that compelling it to choose between effectively executing its

war-making powers and prosecuting criminal actions would lead to the situation the Fourth

Circuit cautioned against in Hamdi, namely that litigation concerns would become the "driving

force" for decisions in the field.  See id.   The government asserts that ordering depositions in

cases such as this would embark upon a course by which "judicial involvement would proceed,

increment by increment, into an area where the political branches have been assigned a

preeminent role." Id.  The force of these decisions and their application in this case, however,

must be evaluated not only in light of the different rights at issue, but also in light of the Supreme

Court's more recent decisions in Rasul v. Bush, 542 U.S. 466, 124 S. Ct. 2686, 159 L. Ed. 2d

548 (2004), which limited the Eisentrager holding, and Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.

Ct. 2633, 159 L. Ed. 2d 578 (2004), which vacated the Fourth Circuit's decision.  Eisentrager

was concerned not with the constitutional rights afforded a defendant facing criminal prosecution

but with what constitutional right, if any, enemy aliens detained abroad after having been tried

and convicted by a competent military tribunal have to challenge their detention in United States federal courts.  See Eisentrager, 339 U.S. at 778, 785.  In Rasul, the Court read Eisentrager narrowly, see Rasul, 542 U.S. at 476, and, over similar objections that interference by the courts would contravene separation of powers principles, concluded that federal courts have jurisdiction over habeas claims of aliens detained in military custody in Guantanamo Bay, Cuba, because jurisdiction over the petitioners' custodians is not in dispute and 28 U.S.C. § 2241, the habeas statute, "by its terms, requires nothing more."  See id. at 483-84.  Rasul also declined to read Eisentrager as limiting federal courts' non-habeas jurisdiction, explaining that the fact that petitioners were detained in military custody outside the United States did not deprive them of the "privilege of litigation" in the federal courts.  See id. at 484-85 (internal quotations omitted).

Hamdi also was not concerned with the rights of a defendant facing criminal prosecution, but rather with the level of judicial review that was appropriate on a challenge to executive detention and its designation of a citizen as an "enemy-combatant."  See Hamdi, 542 U.S. at 509. Hamdi thus does not provide the answer to the conflict between the demand for access to witnesses and the national security concerns presented in this case.   The Supreme Court's decision in Hamdi is instructive, however, insofar as it rejected the assertion that "separation of powers principles mandate a heavily circumscribed role for the courts" in the context of the government's detention of enemy combatants during the ongoing conflict between the United States and al Qaeda.  See Hamdi, 542 U.S. at 535-536 (plurality opinion).

Another line of precedent relied upon by the government – which holds that the Sixth Amendment does not entitle a defendant to an order compelling the prosecution to grant immunity to potential defense witnesses who have invoked their Fifth Amendment right against self-incrimination – similarly fails to support the government's separation of powers argument.

Although courts recognize that due process protects a defendant from prosecutorial overreaching or misconduct, it is well-established that the Sixth Amendment "of its own force" does not "place[] upon either the prosecutor or the court any affirmative obligation to secure testimony from a defense witness by replacing the protection of the self-incrimination privilege with a grant of use immunity."  See United States v. Turkish, 623 F.2d 769, 774 (2d Cir. 1980).  Because concerns associated with granting immunity "are matters normally better assessed by prosecutors than by judges," Turkish, 523 F.2d at 776, even when due process concerns are implicated by evidence of prosecutorial overreaching, courts "leav[e] the immunity decision to the executive branch but interpos[e] the judicial power to subject the government to certain choices of action." United States v. Bahadar, 954 F.2d 821, 826 (2d Cir. 1992); United States v. Salerno, 937 F.2d 797, 807 (2d Cir. 1991) ("the government is in no way required to grant use immunity to a witness called by the defense; it is simply left with a series of choices") (emphasis in original).

In Moussaoui, the Fourth Circuit rejected the government's reliance on this line of cases, reasoning that they in fact stand for the proposition that "courts will compel a grant of immunity, despite the existence of separation of powers concerns, when the defendant demonstrates that the Government's refusal to grant immunity to an essential defense witness constitutes an abuse of the discretion granted to the Government by the Immunity Act."  Moussaoui, 382 F.3d at 468 (emphasis in original).  As the government notes, however, there is no such abuse of discretion evident here.  Although the immunity cases reveal a reluctance to intrude upon matters left to the executive branch, they do not govern this case and do not warrant the conclusion that Paracha's Sixth Amendment right to compulsory process terminates upon an assertion by the government of a national security privilege.  The immunity cases recognize that the Sixth Amendment compulsory process power does not give a court the authority to override a prospective witness's

13

invocation of a constitutionally guaranteed privilege, but they do not address the proposition that the Sixth Amendment right to compulsory process is curtailed when it is the <u>government</u> – as the custodian of a prospective witness – that asserts its own privilege in opposition to the defendant's demand for testimony.

The Supreme Court has treated defendants' claims differently when it is a governmental privilege that conflicts with a defendant's asserted constitutional right to witnesses or evidence. In determining how to balance Paracha's demand for access to witnesses against the government's assertion of a national security privilege, this Court is guided by those cases.  <u>See</u> <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982); <u>Jencks v. United States</u>, 353 U.S. 657, 77 S. Ct. 1007, 1 L. Ed. 2d 1103 (1957); <u>see</u> <u>also</u> <u>Roviaro</u> <u>v. United States</u>, 353 U.S. 53, 77 S. Ct. 623, 1 L. Ed. 2d 639 (1957); <u>Moussaoui</u>, 382 F.3d at 474. "It is unquestionably true that the protection of vital national interests may militate against public disclosure of documents in the Government's possession," and it is equally true that the protection of national security may militate against permitting access to the prospective defense witnesses in this case.  <u>See</u> <u>Jencks</u>, 353 U.S. at 670.  In the context of criminal prosecutions, however, the Supreme Court has repeatedly explained that "the Government can invoke its evidentiary privileges only at the price of letting the defendant go free."  <u>Id.</u> at 671 (internal quotations omitted).

> The rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

<u>Id.</u>  The fair administration of criminal justice requires that evidence be given under appropriate circumstances, as "[t]he very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence."  <u>United</u>

States v. Nixon, 418 U.S. 683, 709, 711-712, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974).  A court's order effectuating a defendant's Sixth Amendment right to access witnesses or evidence does not impermissibly intrude into executive functions; if a defendant demonstrates that evidence would be material and favorable to his defense, a court does not force the government to disclose it but rather it properly leaves the government with a choice: "to decide whether the public prejudice of allowing the crime to go unpunished is greater than that attendant upon the possible disclosure of state secrets and other confidential information in the Government's possession."  Jencks, 353 U.S. at 672; see also United States v. Andolschek, 142 F.2d 503, 506 (2d Cir. 1944).

In sum, the government's assertion of a national security privilege does not impair the court's compulsory process power; the Court thus has the authority to issue a writ ad testificandum to the prospective witnesses' custodian.  Paracha, however, must demonstrate that such an order is necessary to effectuate his Sixth Amendment right to compel witnesses in his defense.

### 2.   Paracha Is Entitled to Present Khan's and al Baluchi's Testimony in his Defense

The right to compulsory process is not unqualified.  Rather, it is subject to "countervailing public interests" that may weigh against a defendant's right to access potential witnesses and compel their testimony.  Taylor, 484 U.S. at 414.  When it is a governmental privilege that weighs against the defendant's demand for witnesses, a proper balancing requires the defendant to show something more than that the witness could provide testimony relevant to his defense.  See Valenzuela-Bernal, 458 U.S. at 872-73; see also Roviaro, 353 U.S. at 60-61.

In Valenzuela-Bernal, the Supreme Court, in analyzing whether a defendant had a right to present the testimony of a witness the government had deported prior to the defendant's trial,

explicated what is required for a defendant to prove a violation of the Sixth Amendment when countervailing governmental interests are at stake.  See 458 U.S. at 862-63.  The Court rejected the test applied by the court below – the United States Court of Appeals for the Ninth Circuit – which required only that the defendant demonstrate that the witness's testimony would "conceivably benefit" the defense.   Id. at 862 (internal quotation omitted).  The Supreme Court expressed concern that the "conceivable benefit" test "misapprehend[ed] the varied nature of the duties assigned to the Executive Branch by Congress."  Id. at 863.  The Court recognized that the government faced a "dual responsibility" where it was "confronted with the obligation of prosecuting persons . . . on criminal charges, and at the same time obligated to deport other persons involved in the event in order to carry out the immigration policies that Congress has enacted."  Id. at 864.  Each is a legitimate and vital responsibility – and the Court cautioned that it would be inappropriate to "minimize the Government's dilemma" in cases where it faces such conflicting responsibilities.  Id. at 865-66.  The Court concluded that where the government's responsibility to carry out immigration policy justified the prompt deportation of a prospective witness, a violation of the Sixth Amendment does not occur without "some showing that the evidence lost would be both material and favorable to the defense."  Valenzuela-Bernal, 458 U.S. at 872-73.

Similarly, in Roviaro, the Supreme Court recognized that "[t]he government generally enjoys a 'privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.'"  United States v. Jackson, 345 F.3d 59, 69 (2d Cir. 2003) (quoting Roviaro, 353 U.S. at 59).  This privilege is intended to encourage citizens to report criminal activity to the police by protecting the informants' anonymity.  See Roviaro, 353 U.S. at 59.  This governmental privilege, however, must give way

"where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause."  See Roviaro, 353 U.S. at 60-61; see also United States v. Saa, 859 F.2d 1067, 1073 (2d Cir. 1988); United States v. Jimenez, 789 F.2d 167, 170 (2d Cir. 1986) (when seeking disclosure of a confidential informant, the "defendant has the heavy burden of showing that disclosure is 'essential to the defense'").

Even in the absence of a specific governmental privilege, courts evaluating requests for writs ad testificandum engage in a similar analysis.  See United States v. Cruz-Jiminez, 977 F.2d 95, 99-100 (3d Cir. 1992); United States v. Gotti, 784 F. Supp. 1011, 1012-13 (E.D.N.Y. 1992). In such cases, courts weigh whether the presence of the witness is necessary for an adequate defense against several factors, including any security risks presented by transporting and permitting the witness to testify in court if that witness is incarcerated.  See Gotti, 784 F.Supp. at 1012.  While the district court's decision to grant or deny a writ ad testificandum is reviewed for abuse of discretion, the exercise of that discretion is "limited by the Sixth Amendment right to have compulsory process for obtaining witnesses in the defendant's favor."  Cruz-Jiminez, 977 F.2d at 100.

The principle gleaned from these cases is that when faced with an assertion of a legitimate governmental privilege to preclude access to a potential witness, a defendant must do more than claim that the witness could provide relevant testimony; he must demonstrate that the witness's testimony would be both material and favorable to his defense.  See Valenzuela-Bernal, 458 U.S. at 867; Roviaro v. United States, 353 U.S. at 60-61.  Once the defendant makes this showing, the constitution requires that he be afforded an opportunity to present the testimony at trial.  Valenzuela-Bernal, 458 U.S. at 873; Roviaro, 353 U.S. at 60-61; see also United States

17

v. Yunis, 867 F.2d 617, 622-23 (D.C. Cir.1989) (applying the Roviaro standard to a request for classified information).  This holds true in cases governed by the Classified Information Procedures Act, ("CIPA"), 18 U.S.C. App. 3, which defines by statute a procedure to protect classified information from unnecessary disclosure while at the same time ensuring that a defendant's right to present evidence in his defense is not compromised.  See 18 U.S.C. App. 3, § 6; see also United States v. Fernandez, 913 F.2d 148, 154 (4th Cir. 1990).  Even in cases in which it is the governmental interest in protecting national security that precludes a defendant's access to or use of information, the government may not "simultaneously prosecut[e] the defendant and attempt[] to restrict his ability to use information that . . . is necessary to defend himself against the prosecution."  See Fernandez, 913 F.2d at 154.

Regardless of the showing made by a defendant, a court will not require disclosure of information; that decision is ultimately left to the government.  But when a defendant seeks disclosure of classified information covered by CIPA and no adequate substitution can be formulated, the court must require the government to choose between disclosure and whatever sanction is necessary to protect the defendant's rights, "presumptively dismissal of the indictment." Moussaoui, 382 F.3d at 476; Fernandez, 913 F.2d at 154.  In this case, Paracha's request for an order compelling depositions or trial testimony of Mohammed, Khan and al Baluchi poses significant risks to national security.  Paracha must, therefore, demonstrate that the testimony of each witness would be material and favorable to his defense before his Sixth Amendment right to compulsory process to present witnesses in his defense will be implicated. See Valenzuela-Bernal, 458 U.S. at 872-73.

a.      **Ammar al Baluchi's anticipated testimony**

The government alleges that defendant and his father, Saifullah Paracha, met with alleged al Qaeda operatives Ammar al Baluchi and Majid Khan in Karachi, Pakistan, and that defendant, in an effort to enable Majid Khan to re-enter the United States, agreed to help Khan obtain immigration documents, use Khan's credit card in the U.S. and make inquiries regarding Khan's bank account to make it appear as though Khan had never left the United States.[1]  The government also alleges that Paracha and his father accepted and held approximately $200,000 of al Qaeda funds in exchange for the assistance Paracha agreed to provide to Khan.  The government alleges that it was defendant's father who introduced defendant to the al Qaeda operatives, and that Saifullah Paracha had also met with Khalid Sheik Mohammed – an alleged mastermind of al Qaeda's terrorist plots, including the attack on the World Trade Center – on more than one occasion.

An essential element of the government's burden of proof on all counts of the indictment is Paracha's knowledge of Khan and al Baluchi's association with al Qaeda and his knowledge that his actions would or could support the al Qaeda organization and not simply its individual members.  Accordingly, testimony tending to undermine the government's assertion that Paracha knew or had reason to believe that his alleged co-conspirators were al Qaeda associates is vital to Paracha's defense.

According to the unclassified summary of statements attributed to Ammar al Baluchi, al Baluchi has stated that neither Paracha nor his father had knowledge of al Baluchi's affiliation

---

[1] These machinations were allegedly necessary because Majid Khan had earlier been granted asylum in the U.S., pursuant to which he was not permitted to leave and re-enter the U.S. without a "refugee travel document."  Khan had in fact left the U.S. to return to Pakistan without securing that document.  Thus, Khan was now allegedly enlisting Paracha in a plan to have Paracha pose as Khan in the U.S., thereby inducing the Department of Homeland Security to issue the refugee travel document to Khan, who would then be able to use that document to re-enter the U.S.   Ammar al Baluchi allegedly introduced Khan to the Parachas to facilitate this scheme.

with al Qaeda or of al Baluchi's intent to use Saifullah Paracha for a larger operation involving

Majid Khan; that al Baluchi "kept his al Qaeda connections hidden" from Saifullah Paracha and

that he "intentionally used cover stories and distorted truths to mask his particular interests with

Saifullah Paracha during their discussions."  (See Unclassified Summaries, at 1).  Al Baluchi also

is reported to have stated that "[n]either [he] nor Majid Khan indicated to Uzair Paracha at any

time that they were mujahidin [sic] or Al Qaeda" and that Saifullah Paracha was unaware of the

true identity of the person known to him as "Uzair" – now understood to be Khalid Sheik

Mohammed – until the worldwide publicity of Khalid Sheik Mohammed's arrest. (Id.).

In statements that could undermine the government's allegation that the $200,000

investment given to Saifullah and Uzair Paracha was to be held for al Qaeda rather than as an

unrelated personal investment in a legitimate business venture, al Baluchi denied that Saifullah

Paracha had ever been "tasked by al Qaeda" to do anything for them and stated that Saifullah

Paracha had "no relation to" al Qaeda.   (Id.).  Al Baluchi's testimony could also cast doubt on

the government's theory that the money was intended as compensation for Uzair Paracha's

assistance because the unclassified material states that "Uzair Paracha was totally unwitting" of

al Baluchi's "intention to use Saifullah Paracha for the broader operational plan involving Majid

Khan."  (Id.).  It is clear, therefore, that testimony from al Baluchi could be material and

favorable to Paracha's defense.

**b.      Majid Khan's anticipated testimony**

According to the unclassified summaries, Majid Khan denied that Uzair Paracha was

motivated to help Khan out a desire to help al Qaeda.  Khan stated that he believed Paracha was

disinterested in extremism and that "[h]e did not assess Uzair Paracha as being suitable for any

other assistance to Al Qaeda besides helping with Majid Khan's documents at the time."
(Unclassified Summaries, at 2).

Khan denied any knowledge of any funding or investments given to Saifullah Paracha by
al Baluchi and stated that he was unaware of Saifullah Paracha's company or any knowledge of a
plan to smuggle chemicals or explosives to the United States through the Parachas.  Khan stated
that "[n]o compensation was given to Saifullah Paracha in return for Saifullah Paracha arranging
for Uzair Paracha to assist Majid Khan with Majid Khan's immigration matters."  (Id.).  Khan
stated that to his knowledge, Paracha did none of the things he was asked to do with respect to
making the immigration authorities believe Khan was in the United States.  (Id.).

Based on these statements, it is evident that Khan, like al Baluchi, could provide material
and favorable testimony for the defense that could raise a doubt as to whether Paracha was aware
that his assistance to Khan would assist al Qaeda.  Khan's testimony also could raise doubt as to
whether Paracha was aware of and intended to facilitate any act of international terrorism as
alleged in Count Five of the indictment.  Finally, Khan's testimony could be helpful and
material, and not merely cumulative, in demonstrating that there was no agreement between
Khan, al Baluchi, Saifullah Paracha and Uzair Paracha regarding the alleged temporary
investment of $200,000 in al Qaeda funds in the Parachas' business ventures.

### c.    Khalid Sheik Mohammad's anticipated testimony

Only one statement disclosed in the unclassified summaries is attributed to the individual
known to Uzair Paracha as "Uzair," who has subsequently been identified as Khalid Sheik
Mohammed: that "Uzair" did not recognize a photograph of Saifullah Paracha taken in the early
1970's.  This statement is simply too remote and isolated to support a claim that Mohammad
would provide material or favorable testimony in Paracha's defense.  Paracha has come forward

with no other support for his claim that Mohammad's testimony would meet such criteria.  Thus, Paracha has not demonstrated the materiality of Mohammad's testimony and is accordingly not entitled to an order compelling Mohammad's production at trial.

### d.       National security concerns

The Court has concluded that Khan and al Baluchi can provide testimony that is both material and favorable to the defense of this action; the government has also demonstrated that the burdens on national security that would arise from permitting access to, or producing Ammar al Baluchi and Majid Khan for trial are substantial.  Granting testimonial writs or ordering Rule 15 depositions would require the confirmation or denial of access to and custody of specific enemy combatants, thereby requiring disclosure of classified information; such a disclosure is inconsistent with national security at this time.  Even assuming the government has control of the witnesses, their removal from their present location or locations and transportation to New York for trial or some other location where secure depositions could be taken would, according to the government, disrupt military operations and undermine the gathering of intelligence information in support of the war on terrorism. (Govt's Mem. in Opp. to Paracha's Mot. for Writs of Habeas Corpus ad testificandum at 6-7).

The government further asserts that ordering access to the witnesses would undermine the government's foreign policy efforts and could "set a precedent that would invite abuse by defendants in other prosecutions of al Qaeda operatives."  (Id. at 21-22).  The potential exists that al Qaeda operatives could use the U.S. legal system to interfere with the military's prosecution of the war on terrorism.  (Id.)  Although there is no evidence of such abuse in this case, based on the information set forth in the government's legal memorandum as well as the ex

parte presentation of classified information made to the Court on November 4, 2005, the Court is satisfied that the government has substantiated its claim that requiring it to give Paracha access to Khan and al Baluchi for purposes of Rule 15 depositions, or requiring their production at trial, would pose a significant threat to national security.

There exists, therefore, a conflict between Paracha's right to present material and favorable testimony from Khan and al Baluchi and the government's legitimate national security concerns in the production of that testimony.  In such circumstances, "[i]f the government refuses to produce the information at issue – as it may properly do – the result is ordinarily dismissal."  See Moussaoui, 382 F.3d at 474; see also Valenzuela-Bernal, 458 U.S. at 873-74; Jencks, 353 U.S. at 672; Roviaro, 353 U.S. at 61.

This Court concludes, however, that the ordinary sanction of dismissal is not warranted in light of the unique circumstances of this case which permit the Court to fashion a remedy that will permit Paracha to present the testimony of Khan and al Baluchi without requiring their production at trial.  See Moussaoui, 382 F.3d at 476.  To begin with, the government has not deprived Paracha of any and all information relevant to Khan and al Baluchi.  Both individuals made statements regarding their relationship with defendant that are relevant to the charges in the indictment and, pursuant to its Brady obligations, the government has disclosed those statements that tend to exculpate Paracha.   The availability to the defense of the witnesses' statements contrasts to the circumstances in cases where dismissal is the appropriate remedy.  See e.g., Valenzuela-Bernal, 458 U.S. at 871.  Because, in this case, the "substance of [the prospective witnesses'] exculpatory evidence" can be presented through means other than the witnesses' live testimony, Paracha's Fifth and Sixth Amendment rights can be protected.  See Buie v. Sullivan, 923 F.2d 10, 13 (2d Cir. 1990) (finding no Fifth or Sixth Amendment violation where the arrest

of a prospective defense witness led to invocation of that witness's right against self-incrimination in part because the witness's exculpatory statements were presented through another witness).

Although the availability of the statements by itself does not warrant denial of Paracha's request for access to the witnesses, in this case, defendant has agreed that the unclassified summaries of Khan and al Baluchi constitute an adequate substitution for their live testimony so long as the statements are introduced to the jury with appropriate instructions from the Court. (See Decl. of Edward D. Wilford, dated Sept. 13, 2005, at 10-11).  Indeed, the use of these statements as an alternative to a deposition or live trial testimony will permit Paracha to present the witness's exculpatory statements without the introduction by the government of any inculpatory statements they might have made, and without subjecting the witnesses to cross-examination by the government.  The statements directly touch on the question at the crux of this case – whether Paracha was aware of Khan and al Baluchi's al Qaeda affiliation when he agreed to assist them – and, importantly, in making his arguments about the materiality of their testimony, Paracha has not suggested that either Khan or al Baluchi would or could offer anything additional to, or different from, what is reflected in these statements.   In these unique circumstances, the case may proceed without requiring the government to produce Khan or al Baluchi for trial or for a deposition.

> ### e.       Proper jury instructions for the introduction of the unclassified summaries

The Court must determine what instructions should accompany the unclassified summaries when they are presented to the jury.  The only case of which the Court is aware that has engaged in similar analysis is the Fourth Circuit's opinion in Moussaoui.  See 382 F.3d at

478-82.  The standard articulated in CIPA, which requires that unclassified summaries of classified materials must "provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information," also provides guidance. 18 U.S.C. App. 3, § 6(c)(1); see United States v. Rezaq, 134 F.3d 1121, 1142-43 (D.C. Cir. 1998).

Paracha has proposed several specific instructions that he asserts are necessary to give him a substantially similar alternative to live testimony.  Paracha has proposed that the Court instruct the jury, inter alia, that the witnesses are providing assistance to the U.S. government and that the government has found the witnesses to be credible.[2]

Paracha's proposed instructions are problematic for two reasons: (1) they assume facts that the Court does not know to be true – i.e., whether or not the witnesses are in fact providing assistance to the government rather than misleading it; and (2) they take the function of judging witness credibility away from the jury.  On the other hand, the jury must be told more than simply that the statements were made by Khan and al Baluchi because the jury would then have no basis upon which to assess the declarant's credibility.

The Fourth Circuit approved of the adequacy of the statements in Moussaoui only because it was convinced that "those who are [questioning] the witnesses have a profound interest in obtaining accurate information from the witnesses and in reporting that information

---

[2] Specifically, Paracha requests the jury be instructed that:
> (1) the witnesses are in U.S. custody; (2) the witnesses are providing material assistance to the U.S. in pursuit of the war on terrorism; (3) the witnesses have provided reliable information to the government in the past; (4) the government continues to rely on information provided by the witnesses; (5) the government has found the witnesses to be credible; (6) The witnesses were questioned by United States government officials while in custody in relation to their relationship with the defendant; (7) the witnesses [sic] have a profound interest in obtaining accurate information and reporting that information accurately to 'those who can use it to prevent acts of terrorism and to capture other al Qaeda operatives;' and (8) the failure to provide truthful information would be detrimental to the witnesses' relationship to the U.S. government.

(See Decl. of Edward D. Wilford, dated Sept. 13, 2005, at 10-11) (emphasis omitted).  In his seventh requested instruction, Paracha appears to misinterpret a redacted reference in the Moussaoui decision.  The surrounding context of the decision, and logic, suggest that the Fourth Circuit envisioned an instruction that those who are questioning the witnesses, not the witnesses themselves, have a profound interest in obtaining accurate information. See Moussaoui, 382 F.3d at 487.

accurately to those who can use it to prevent acts of terrorism and to capture other al Qaeda operatives."  Id. at 478.  That court reasoned that those considerations "provide sufficient indicia of reliability to alleviate the concerns of the district court [that the statements were unreliable]."  Id.  Accordingly, the Fourth Circuit directed the trial court to give instructions that explain both what the statements are and that they were made in a context giving them some indicia of reliability.  Specifically, the court explained that:

> the jury must be informed, at a minimum, that the substitutions are what the witnesses would say if called to testify; that the substitutions are derived from statements obtained under conditions that provide circumstantial guarantees of reliability; [and] that the substitutions contain statements obtained over the course of weeks or months….

Id. at 480-81.  In directing the crafting of an adequate substitution, the Fourth Circuit was "mindful of the fact that no written substitution will enable the jury to consider the witnesses' demeanor in determining their credibility," but believed that its instructions "plus any other instructions the district court may deem necessary in the exercise of its discretion, adequately address this problem."  Id. at 481, n.38.

Here, too, in the event Paracha chooses to admit statements made by Khan or al Baluchi, the jury will be unable to consider the witnesses' demeanor and must accordingly be given some information regarding the context in which the statements were made that bear on their reliability.  Although the Court will not instruct the jury that the statements are in fact accurate, the jury will be instructed as follows:

> You will hear testimony from the written statements of two witnesses – Majid Khan and Ammar al Baluchi – who will not appear at this trial. Those statements were made while the witnesses were in custody.  For the purposes of this trial only, you may assume that the United States government has custody of these two witnesses and control over the conditions of their confinement.
> The witnesses were questioned on multiple occasions over some period of time.  The witnesses were questioned in relation to their relationship with the defendant.

None of the attorneys in this action has had access to the two witnesses. The witnesses are segregated from each other and are not able to coordinate their statements. The witnesses have had no contact with the defendant since his arrest.

The witnesses' statements were obtained under circumstances that were designed to elicit truthful and accurate information from the witnesses because the statements are relied upon by United States officials responsible for making national security decisions. The failure to provide truthful information would be detrimental to any relationship to the United States government by the witnesses.

Those who questioned the witnesses have a profound interest in obtaining accurate information from the witnesses and in reporting that information accurately to those who can use it to prevent acts of terrorism and to capture other al Qaeda operatives.

It is your decision, after reviewing all the evidence, whether to accept the testimony of these two witnesses just as it is with every other witness and to give that testimony whatever weight that you find it deserves.

These instructions are designed to give the jury a basis for evaluating the statements, but to leave to the jury the function of determining their credibility and what weight, if any, they are to be given. Because Paracha has had no opportunity to confront Khan or al Baluchi, none of their statements may be used affirmatively by the government in its case against Paracha. See Moussaoui, 382 F.3d at 482. Similarly, the government may not argue to the jury that if the witnesses had been present for cross examination at trial they might have provided inculpatory evidence in addition to the exculpatory statements offered by the defendant. The government may, however, ask the jurors to utilize their good judgment, common sense and life experiences in judging the credibility of the witnesses' statements just as they would with any other witness.

## C.     Defendant Is Not Entitled to the Trial Testimony of Saifullah Paracha

The fourth potential defense witness – Saifullah Paracha – has been classified as an "enemy combatant" by the United States government and the government has acknowledged that he is being held in the U.S. Naval Base in Guantanamo Bay, Cuba. The government previously agreed to make Saifullah Paracha available for a Rule 15 deposition to be taken at Guantanamo Bay, and the Court ordered that to occur. But, as noted, Paracha subsequently decided not to

proceed with that deposition and now seeks a writ ad testificandum directing Saifullah's production for live testimony at trial.  The government opposes the issuance of that writ, contending that the extraordinary logistical costs of transporting Saifullah Paracha from Guantanamo to the Southern District of New York for trial, and potential risks to national security in permitting his live in-court testimony, counsel against the issuance of a trial writ, particularly in light of the nearly equivalent available alternative of video-taping a deposition in Guantanamo Bay which would not impose the same costs or security risks.   The government also opposes any use by Uzair Paracha of Saifullah Paracha's unclassified statements in a manner similar to that of the statements of Khan and al Baluchi on the ground that Paracha unilaterally decided not to depose Saifullah and thus should not be permitted the use of what would have formed a substitution for the Rule 15 deposition.

As noted above, when a defendant seeks the Court's assistance in effectuating his Sixth Amendment right to present witnesses in his favor, and when the prospective witness is held in custody within the Court's process power, the proper procedure is for the defendant to seek the issuance of a writ ad testificandum.  See United States v. Cruz-Jiminez, 977 F.2d 95, 99-100 (3rd Cir. 1992); United States v. Gotti, 784 F.Supp. 1011, 1012-13 (E.D.N.Y. 1992).  A court's authority to issue that writ derives from 28 U.S.C. § 2241(c)(5), which provides that "[t]he writ of habeas corpus shall not extend to a prisoner unless . . . [i]t is necessary to bring him into court to testify or for trial."  28 U.S.C. § 2241(c)(5).

Several factors are relevant in determining whether or not to grant the testimonial writ, including: whether the presence of the witness is necessary for an adequate defense; the security risks presented by permitting the prisoner to testify in court; the danger to the public inherent in transporting prisoners over long distances; whether the witness to be called could offer evidence

that was relevant; and whether the evidence to be offered, although relevant, was cumulative.
See Gotti, 784 F.Supp. at 1012; see also Cruz-Jiminez, 977 F.2d at 100. Again, however, a
court's exercise of its discretion in weighing these factors is "limited by the Sixth Amendment
right to have compulsory process for obtaining witnesses in the defendant's favor." Cruz-
Jiminez, 977 F.2d at 100.   The Sixth Amendment affords a defendant the right to compel the
testimony of a witness where that testimony would be both material and favorable to his defense.
See Valenzuela-Bernal, 458 U.S. at 867.

        The materiality of Saifullah Paracha's testimony is not in dispute.  The government
opposes the request for a trial writ on the basis of the attendant logistical burdens and risk to
national security.[3]  Specifically, the government notes that because Saifullah Paracha is a
designated enemy combatant currently in the custody of the Department of Defense, transporting
him from Guantanamo Bay, Cuba, transferring custody from the Department of Defense to the
United States Marshal Service for his production in the courtroom to testify, and again
transferring him to the custody of the Bureau of Prisons to be housed for the duration necessary
to present his testimony would require significant investments of security personnel and
attendant security risks.   Because Saifullah Paracha is not a citizen of the United States, his
transportation into the United States and his subsequent return to Cuba would also require the
involvement of the Bureau of Immigration and Customs Enforcement of the Department of
Homeland Security, significantly complicating the necessary logistical arrangements.  The Court

---

[3] The government suggests that the request should also be denied on the ground that it was untimely, since it was
made less than two weeks in advance of trial.  However, the issue of Saifullah's availability vel non for trial has
been an issue in this action since February.  (See Letter from Edward D. Wilford to Karl Metzner, dated February 4,
2005).  Thus, there has been no unfair surprise or delay in Paracha's October 24 request that Saifullah Paracha be
brought here to testify at trial, see Taylor, 484 U.S. at 401-02, and in any event, the Court is loathe to resolve such
an important issue on the basis of timeliness alone.

agrees that transporting and housing the witness would involve considerable expense, involvement of security personnel, and attendant national security risks.

Moreover, permitting live, in-court testimony poses a risk of inadvertent disclosure of classified information.  To alleviate that risk, the parties stipulated that the deposition would be taken in a secure location, that the transcript and videotape of the deposition would be initially treated as classified and would immediately be submitted to the proper classifying authority for an expedited classification review in light of the need to have the unclassified transcript and videotape available for use at trial.  (Stipulation and Order, dated May 20, 2005, at ¶ 6).  In the event that portions of the transcript or tape were classified pursuant to the classification review, any party seeking to use classified portions at trial would have the opportunity to invoke CIPA review procedures before this Court.  (Id.).  No similar reasonable accommodation of the government's interest in protecting classified information against the risk of inadvertent disclosure is possible if Saifullah Paracha were to be examined initially at a public trial.

As noted, the Court has ordered that Paracha, through his counsel, be permitted to take a Rule 15 deposition of Saifullah Paracha at Guantanamo Bay that would be both transcribed and videotaped.  (Stipulation and Order, dated May 20, 2005, at ¶ 2).  The Court took steps to ensure that defendant was aware of his right to be present at that deposition; he waived that right in writing.  (See Waiver of Presence at Deposition, signed by Uzair Paracha, dated May 19, 2005).  The Stipulation and Order provided that defense counsel would be permitted to examine Saifullah Paracha "as if on direct examination," after which he would be cross-examined by the government, and the defense counsel could then ask further questions on re-direct.  (Stipulation and Order, dated May 20, 2005, at ¶ 9).  Thus, the defense would have the opportunity to elicit the sworn testimony of Saifullah Paracha and to ask the questions it believes necessary to draw

out relevant and helpful testimony.  Although the presentation of a witness's testimony live and in-court is preferable to any other alternative, the use of videotaped depositions largely – if not entirely – preserves the jury's ability to judge the credibility of a witness by such avenues as demeanor, expression and tone of voice.

In light of the significant logistical burdens and risk to national security that would be posed were the government required to bring Saifullah Paracha to this district to testify at trial, and in light of the availability to the defense of a previously agreed upon videotaped deposition that would preserve defendant's ability to take and present the testimony of Saifullah Paracha to the jury, Paracha's request for a writ ad testificandum directing the production of Saifullah Paracha for testimony at trial is denied.

Because defendant has been afforded the opportunity to depose Saifullah Paracha but chose not to do so, he is not entitled to any "substitution" for the deposition and thus will not be permitted to introduce the statements of Saifullah Paracha reflected in the declassified materials provided pursuant to the government's Brady obligations at trial.


## II.    The Government's Proposed Expert

In late September 2005, the government provided the defense with notice of its intent to call Evan Kohlmann as an expert witness at trial together with Kohlmann's curriculum vitae and a synopsis of his proposed testimony.  Based on that information, Paracha moved in limine to preclude admission of Kohlmann's proposed testimony.  Paracha objected to the testimony on several grounds and requested that the Court hold a pre-trial hearing to test the reliability of the expert's methodology.   At a pre-trial conference on October 28 the Court heard extensive oral argument on the issue and on November 2 held a full day evidentiary hearing.

On the basis of the testimony of Mr. Kohlmann and additional evidence presented at that hearing, the Court concluded that the government has met its burden of establishing that its proposed expert has sufficient education, training and knowledge to be qualified as an expert and that Kohlmann's methodology is sufficiently reliable and reliably applied in reaching the conclusions he proposes to offer in this case to meet the standards for the admissibility of expert testimony set by the Federal Rules of Evidence and relevant case law.

For the reasons set forth below, expert testimony was permitted at trial on the origins and structure of al Qaeda, its leaders, and its use of cells and individuals to provide logistical support; evidence was not permitted to be adduced regarding the two al Qaeda operatives alleged to be co-conspirators of Paracha: Ammar al Baluchi and Majid Khan.  Testimony regarding those two individuals is properly admitted through fact witnesses, not an expert.  Similarly, no expert testimony was permitted to describe the background and alleged activities of another alleged co-conspirator, Aafia Siddiqui.  Finally, no expert testimony was permitted regarding al Qaeda's purported use of counter-interrogation techniques because it would impermissibly intrude upon the jury's role of judging the credibility of witnesses.

## A.    Factual Background

The government indicated that the bulk of its proof on each of the five different counts charging Paracha with aiding al Qaeda will consist of statements made by Paracha himself to government agents describing his knowledge of the al Qaeda affiliation of Khan and al Balcuhi, the tasks he was asked to carry out to enable Khan to re-enter the United States and the approximately $200,000 in al Qaeda funds that was to be held as an investment in a Paracha family business until the funds were needed by al Qaeda.  The government also proffered that it would present evidence – again in the form of Paracha's own statements – that Paracha's father,

who is an alleged co-conspirator, met with various al Qaeda leaders and members on several occasions, including its leader, Usama bin Laden, and the purported "mastermind" of al Qaeda terrorist attacks, Khalid Sheik Mohammed. The government proposed to introduce expert testimony to put its evidence of Paracha's alleged assistance to al Qaeda in context.  For that purpose, the government proposed to elicit testimony from its expert regarding the history and structure of al Qaeda and to have the expert identify key leaders of the al Qaeda organization, including Usama bin Laden and Khalid Sheik Mohammed.

Additionally, the government sought to elicit expert testimony to establish that Paracha's alleged co-conspirators, Ammar al Baluchi and Majid Khan, are al Qaeda members, and to establish the role each of them play in facilitating, planning and carrying out terrorist plots. Similarly, the government sought to elicit from Kohlmann a description of the roles of other alleged al Qaeda members or associates mentioned by Paracha in his statements to law enforcement officials.   Finally, the government sought to elicit expert testimony regarding alleged al Qaeda counter-interrogation techniques; specifically, that al Qaeda operatives are trained to provide false and misleading information if captured and interrogated.

### B.      Admissibility of Expert Testimony

Rule 702 of the Federal Rules of Evidence permits expert testimony in the form of an opinion or otherwise if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  Rule 702 establishes three prerequisites for the admissibility of such expert testimony, namely, that: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  The United States Supreme Court in <u>Daubert v. Merrell Dow</u>

Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), explained that

the trial court must act as a gatekeeper to ensure expert testimony is properly admitted; before

expert testimony is admitted, the district court must make a "preliminary assessment of whether

the reasoning or methodology underlying the testimony is scientifically valid and of whether that

reasoning or methodology properly can be applied to the facts in issue."  Daubert, 509 U.S. at

592-93; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed.

2d 238 (1999).

     In Daubert, the Court outlined several factors for consideration in evaluating an expert's

methodology, including:  whether it has been tested and subjected to peer review and

publication; its error rate; the existence and maintenance of standards controlling the

methodology's operation; and whether it has been generally accepted in the scientific

community.  Daubert, 509 U.S. at 593-94.  Where, as here, the proposed expert testimony is not

of a technical nature, but rather falls within the ambit of social science, this Court is guided by

the objective of the Daubert factors, and not a mechanical application of each one.  See Kumho

Tire, 526 U.S. at 152.  This Court's task is "to make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same

level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Id.

     Because the materials submitted by the government in connection with its notice of intent

to call the expert were not sufficient to demonstrate the reliability of the expert's methodology

and its reliable application to this case, Paracha's request for a hearing was granted.  See 4

Weinstein's Federal Evidence § 702.02[6][b] (2d ed. 2004).  The proponent of expert testimony

– here, the government – has the burden of showing that the expert's methodology and the

application of that methodology in this case are reliable.  See Daubert, 509 U.S. at 593, n.10; see

also United States v. Yousef, 327 F.3d 56, 148 (2d Cir.), cert. denied, 540 U.S. 933, 124 S. Ct.

353, 157 L. Ed. 2d 241 (2003); United States v. Rahman, 189 F.3d 88, 134 (2d Cir. 1999).

### C.      The Expert's Experience and Methodology

Testimony and evidence presented at the hearing demonstrate that Evan Kohlmann possesses sufficient education, training and experience to qualify as an expert on the origins, leadership and tradecraft of the al Qaeda organization.   Kohlmann is currently self-employed as the President and Founder of Globalterroralert.com, a clearinghouse for information regarding terrorism.  He undertook this position after several years of experience as a consultant at the Investigative Project, a think tank devoted to researching terrorist organizations.  (See Tr. of Nov. 2, 2005 Hr'g at 20-22, 29-30).   Kohlmann has earned degrees in law, foreign service and Islamic studies.  During the course of his education he has authored several theses on topics related to the testimony he proposes to offer in this case.  (Id. at 10-12, 15, 19).  Kohlmann's research has focused on "Arab-Afghan" groups of Mujahadeen fighters in various locales and on the development of extremist groups, including al Qaeda.  (See e.g., id. at 17-18, 40).

As Kohlmann explained, his methodology consists of gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information and evaluating new information to determine whether his conclusions remain consonant with the most reliable sources.   (Id. at 73-76).  He describes his work as a study of the micro-history of al Qaeda and its involvement in regional conflicts. (Id. at 76).  His methodology is similar to that employed by his peers in his field; indeed, he explained that he works collaboratively with his peers, gathering additional information and seeking out and receiving comments on his own work.  (Id. at 76-77).

Paracha challenges the reliability of this methodology, characterizing it as a mere culling from a handful of cases and internet reports information that the user deems reliable.  Although Kohlmann's methodology is not readily subject to testing and permits of no ready calculation of a concrete error rate, it is more reliable than a simple cherry-picking of information from websites and other sources.  The testimony and evidence at the hearing demonstrate that Kohlmann's opinions and conclusions are subjected to various forms of peer review and that the opinions he proposes to offer here regarding al Qaeda's origins, leaders and certain tradecraft are generally accepted within the relevant community.  (See Tr. of Nov. 2, 2005 Hr'g at 168-73).  Kohlmann's methodology, as he describes it, is similar to that employed by experts that have been permitted to testify in other federal courts involving terrorist organizations.  See United States v. Damrah, 412 F.3d 618, 625 (6th Cir. 2005); United States v. Hammoud, 381 F.3d 316, 337 (4th Cir. 2004) vacated and remanded on other grounds by, 125 S. Ct. 1051, 160 L. Ed. 2d 997, reinstated in relevant part by, 405 F.3d 1034 (4th Cir. 2005).   Whatever the general pitfalls of the "vetting process" that is employed by Kohlmann and others in his field, it is a sufficiently reliable methodology to meet the requirements of Fed. R. Evid. 702.  See Hammoud, 381 F.3d at 337.

Paracha also challenges Kohlmann's reliance on certain hearsay materials, the reliability of which he contends is suspect.  The government correctly counters that expert witnesses may testify to opinions based on hearsay or other inadmissible evidence where experts in that field reasonably rely on such evidence in forming their opinions.  See United States v. Daly, 842 F.2d 1380, 1387 (2d Cir. 1988).  Although Kohlmann does collect original materials from the groups he studies, similarly to law enforcement officers who offer expert testimony on the workings of criminal organizations, see e.g., United States v. Locascio, 6 F.3d 924, 938 (2d Cir. 1993),

Kohlmann also necessarily relies on secondary sources to form his opinions about secretive terrorist organizations.  His use of such sources is permissible.

In sum, based on the testimony presented at the evidentiary hearing on this issue, the government has sufficiently demonstrated the reliability of Kohlmann's methodology and the government was permitted to elicit his expert opinion on those topics on which that methodology is reliably applied and is appropriate and necessary to assist the jury in understanding the issues in this case.

### D.     The Scope of Expert Testimony

The areas the government seeks to cover with this expert are properly considered in three separate categories: (1) the origins, structure and leadership of al Qaeda; (2) the roles of alleged co-conspirators Majid Khan, Ammar al Baluchi and Aafia Siddiqui in the al Qaeda organization; and (3) al Qaeda's use of counter-interrogation techniques – part of its "tradecraft" – that bears on the credibility of fact witnesses expected to offer testimony on behalf of defendant.  Each is considered in turn.

### 1.     Origins, Structure and Leadership of al Qaeda

The government may elicit expert testimony regarding al Qaeda's origin, leadership, and operational structure, as such testimony will aid the jury in understanding how al Qaeda came to be and the manner in which it currently functions.  This area of testimony is analogous to the type of expert testimony regularly permitted by the United States Court of Appeals for the Second Circuit in cases involving organized crime families.  See e.g., United States v. Amuso, 21 F.3d 1251, 1263-64 (2d Cir. 1994); United States v. Locascio, 6 F.3d 924, 936 (2d Cir. 1993); United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988).  Paracha attempts to distinguish these

cases on the ground that each involved violations of the Racketeer Influenced and Corrupt Organizations Act, and expert testimony regarding the criminal organizations was appropriate because it was necessary to establish the existence of a criminal enterprise.  This distinction does not provide a basis for excluding background expert testimony on al Qaeda.  The primary purpose of the expert testimony in the organized crime cases was not to establish the existence of a criminal enterprise, but rather to give the jury a general understanding of the nature of the criminal organization at issue.  See Daly, 842 F.2d at 1388-89.   Similarly, here the government may use expert testimony to assist the jury in understanding the nature and functioning of the organization Paracha is alleged to have assisted.  See id.

It is undoubtedly true, as Paracha insists, that the jurors will already be aware of the existence of an entity known as al Qaeda and that its leader is Usama bin Laden.  However, just as in Amuso, where media coverage of organized crime did not require exclusion of expert testimony on that subject, expert testimony about al Qaeda is appropriate despite its regular appearance in the popular media both because the media's depiction may be misleading and because some features of al Qaeda relevant to the allegations in this case remain "beyond the knowledge of the average citizen."  Amuso, 21 F.3d at 1264.

## 2.      Alleged Co-Conspirators

While it is proper for the expert to give the jury information regarding the origins and structure of al Qaeda that will put the government's evidence in context, what the government may not do is use its expert to provide a summary of factual evidence regarding the specific individuals alleged to be co-conspirators in this case.  See Daly, 842 F.2d at 1388.

As evidenced from his testimony at the pre-trial hearing, Kohlmann's proposed testimony regarding Ammar al Baluchi and Majid Khan and their roles in al Qaeda is based substantially on

his review of unclassified summaries of statements made by Khan and al Baluchi that were disclosed to the defendant as part of the government's Brady obligations, and are the same summaries that have been offered to the defendant as a substitution for his constitutional right to present testimony from those witnesses.  (See Tr. of Nov. 2, 2005 Hr'g. at 83-87, 87-92; Gov. Exs. 4, 5).  The Court is concerned that the expert's utilization of those statements in developing opinion testimony to be offered against Paracha in effect constitutes use by the government of those statements in contravention of the ruling that has been crafted to satisfy defendant's Sixth Amendment right to present witnesses in his defense; i.e., that among other matters, the government cannot affirmatively use the unclassified summaries on its own case.

At the hearing, Kohlmann reviewed each paragraph of the unclassified summaries, explaining his interpretation of each statement and how it led to the conclusions and opinions he would offer regarding Khan and al Baluchi.  (See Tr. of Nov. 2, 2005 Hr'g. at 83-87, 87-92). Particularly striking is his nearly exclusive reliance on Khan's statements in the unclassified summaries to form his opinion regarding Khan's role in al Qaeda.  (See id. at 87-89, 175).

The manner and extent to which Kohlmann relied upon the unclassified summaries in reaching his conclusions on Khan and al Baluchi stands in contrast to the method Kohlmann described in reaching his conclusions about al Qaeda generally and about the identity and role of other relevant al Qaeda figures.  In developing his opinion on Khalid Sheik Mohammed, for example, Kohlmann relied on multiple sources of information that he gathered and vetted through his process of cross-referencing and peer review, and explained that he has been gathering information relevant to Mohammed for several years.  (See id. at 159-60).  When an expert's conclusions are drawn largely from his knowledge of materials in the government's case file, "rather than upon his extensive general experience" in the field, those conclusions are

beyond the proper limits for expert testimony.  See United States v. Dukagjini, 326 F.3d 45, 55 (2d Cir. 2002).

The Second Circuit recognized in Dukagjini that "in some cases it may be difficult to discern the line between permissible and impermissible reliance on hearsay."  See id.  In this case, the expert's reliance on the unclassified summaries that the government will be precluded from offering directly as evidence against Paracha falls on the impermissible side of that line, and thus, the expert was precluded from testifying regarding the roles of al Baluchi or Khan in al Qaeda and in the transactions at issue here.  This sort of summarizing of factual evidence is particularly of concern here where the government will offer no fact witness on these issues that the defendant could test through cross-examination.

The proposed expert testimony regarding another alleged co-conspirator, Aafia Siddiqui, was also precluded.  Siddiqui is alleged to have played a specific role in the alleged conspiracy, and evidence regarding her actions that are relevant to the charges here is appropriately brought in through fact witnesses, not expert testimony.  The proposed expert testimony regarding her alleged past involvement in unrelated terrorist fundraising is only minimally, if at all, relevant to the issues in this case.  The testimony was therefore excluded pursuant to Fed. R. Evid. 403 because any probative value is substantially outweighed by the risk of unfair prejudice.

### 3.    Al Qaeda Tradecraft: Counter-Interrogation Techniques

The government also sought to elicit expert testimony regarding counter-interrogation techniques employed by al Qaeda operatives.  The expert's opinion on this issue is premised upon a purported al Qaeda training manual that was seized at the home of a known al Qaeda member in England and instructs operatives to coordinate a plan as to what to say in the event of capture, to deny accusations and to provide deceptive responses to questioning.  Paracha raises

several objections to this area of testimony, contending that it would impermissibly intrude on the jury's fundamental function of judging witness credibility; that it is premised on pure speculation that either al Baluchi or Khan have read, been instructed upon, or followed the dictates of the training manual; and that such testimony would undermine the adequacy of the substitutions of Khan and al Baluchi's statements that have been offered as alternatives to their live testimony.   The Court agrees; despite the government's protestations to the contrary, the relevance of that testimony – that al Qaeda operatives such as Khan and al Baluchi are trained to provide deceptive, false and misleading answers to their interrogators when captured – is solely to undermine the credibility of the witnesses' statements that tend to exculpate Paracha.  Because the Court finds this area of expert testimony impermissibly intrudes on the jury's function in the context of this case, it is excluded.

The Second Circuit has held that permitting expert witnesses to "opine as to the credibility of the testimony of other witnesses at the trial" is error.  See United States v. Scop, 846 F.2d 135, 142 (2d Cir. 1988), rev'd in part on other grounds, 856 F.2d 5 (2d Cir. 1988); see also Nimely v. City of New York, 414 F.3d 381, 397-98 (2d Cir. 2005); United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir.1999).  "It is a well-recognized principle of our trial system that "determining the weight and credibility of [a witness's] testimony.... belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men."  Nimely, 414 F.3d at 397-98.  Accordingly, the Second Circuit "has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702."  Id.

The government seeks to avoid this problem by stating that it would elicit only general testimony regarding al Qaeda's alleged methods of counter-interrogation and that no ultimate opinion as to the credibility of statements made by Khan and al Baluchi would be offered. Nonetheless, it is clear that the sole relevancy of this area of testimony would be to undermine the credibility of Khan and al Baluchi's statements.  In evaluating the proposed expert testimony, the validity of the expert's methodology is not the sole consideration; the court must also consider whether the expert testimony would "'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'"  Lumpkin, 192 F.3d at 289 (quoting United States v. Duncan, 42 F.3d 97, 101 (2d Cir.1994)).  The Court is also cognizant that "the added aura of reliability that necessarily surrounds expert testimony" may improperly place the fact witness's credibility in jeopardy.  Id. In light of these concerns, the government's proposed expert testimony regarding al Qaeda counter-interrogation techniques is excluded.


III.    **Jury Instructions on the Mens Rea Requirement for 18 U.S.C. § 2339B**

The proposed jury instructions submitted by the parties present this Court with the question of what mens rea is required to sustain a conviction under 18 U.S.C. § 2339B, the provision of the Antiterrorism and Effective Death Penalty Act of 1996, ("AEDPA"), that makes it unlawful to "knowingly provide[] material support or resources to a foreign terrorist organization."  18 U.S.C. § 2339B(a)(1).  Two counts of the five count indictment against defendant Uzair Paracha charge violations of 18 U.S.C. § 2339B; Count One charges Paracha with violating that statute by conspiring to provide material support or resources to al Qaeda and

Count Two charges Paracha with actually providing or attempting to provide material support or resources to al Qaeda.

The government proposes that the <u>mens rea</u> requirement of 18 U.S.C. § 2339B will be satisfied if it proves that defendant acted voluntarily and that he knew that al Qaeda had been designated by the Secretary of State as a "foreign terrorist organization" or that al Qaeda had conducted or engaged in "terrorist activity."  (<u>See</u> Govt's Proposed Jury Instructions, at 23). Paracha contends that the government must also prove that Paracha "knew that what he was furnishing to the [foreign terrorist organization] was in fact 'material support'" and that he "acted with the specific intent that his provision of support would further the illegal activities of the [foreign terrorist organization]."  (<u>See</u> Def's Request to Charge, at 4).

This Court previously considered one aspect of the <u>mens rea</u> required to prove a violation of section 2339B in the context of Paracha's January 2004 motion to dismiss the indictment. There, Paracha urged that section 2339B is unconstitutionally vague because it fails to provide fair notice that assisting an individual who is a member of a terrorist organization means, <u>ipso facto</u>, that one is providing material support or resources to the terrorist organization.   This Court denied Paracha's motion to dismiss the indictment on the ground that the statute and the allegations against Paracha were fairly construed as requiring that the government prove "not only that Paracha in fact rendered material support or assistance . . . to one or more members of al Qaeda, but also that he acted with the knowledge that his support would be used to further al Qaeda activities and not just the personal interests of the individual members."  (<u>See</u> Tr. of Nov. 15, 2004 Conf. at 7).

In accord with that prior ruling, the Court instructed the jury that the government must prove that in providing material support or resources, Paracha did so knowing that the material

support or resources could or would be utilized to further the activities of the al Qaeda entity and

not just the personal interests of al Qaeda's individual members.  The Court now addresses only

those challenges to section 2339B not previously raised, and declines to charge the jury with the

additional levels of intent Paracha now requests because they are inconsistent with the statutory

text and not constitutionally required.

### A.      The Statute – 18 U.S.C. § 2339B

At all times relevant to this case, 18 U.S.C. § 2339B(a)(1) provided:

> Whoever, within the United States or subject to the jurisdiction of the United
> States, knowingly provides material support or resources to a foreign terrorist
> organization, or attempts or conspires to do so, shall be fined under this title or
> imprisoned not more than 15 years, or both, and, if the death of any person
> results, shall be imprisoned for any term of years or for life.

AEDPA, § 303(a), 110 Stat. 1250 (Apr. 24, 1996), as amended by the USA Patriot Act of 2001,

Pub. L. 107-56, § 810(d), 115 Stat. 380 (Oct. 26, 2001).  This section was subsequently amended

by the Intelligence Reform and Terrorism Prevention Act of 2004, ("IRTPA"), Pub. L. 108-458,

§ 6603(c), 118 Stat. 3762-63 (Dec. 17, 2004) (current version at18 U.S.C. § 2339B(a)(1)).

Material support or resources was defined by 18 U.S.C. § 2339A(b) to mean "currency or

monetary instruments or financial securities, financial services, lodging, training, expert advice

or assistance, safehouses, false documentation or identification, communications equipment,

facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical

assets, except medicine or religious materials."  AEDPA § 323, 110 Stat. at 1255, as amended by

the USA Patriot Act of 2001, Pub. L. 107-56, § 810(a), 115 Stat. 377 (Oct. 26, 2001); current

version at 18 U.S.C. § 2339A(b).

**B.      No Intent to Further the Illegal Activities of the Foreign Terrorist Organization Is Required**

Paracha urges that to support a conviction under 18 U.S.C. § 2339B the government must prove that when he knowingly took the actions constituting the provision of material support or resources, he acted with the specific intent that his provision of support would further the illegal activities of the foreign terrorist organization.  Paracha has not submitted legal argument in support of his requested instruction, but cites to United States v. Al-Arian, 308 F. Supp. 2d 1322, reconsideration denied, 329 F. Supp. 2d 1294 (M.D. Fla. 2004) as support for this additional mens rea requirement.  The district court in Al-Arian concluded that this additional level of scienter was necessary to save the statute from serious constitutional questions regarding freedom of association and the due process requirement of personal guilt, but that conclusion departs from the majority of existing authority and this Court does not find it to be persuasive. See Humanitarian Law Project v. U.S. Dept. of Justice, 352 F.3d 382 (9th Cir. 2003) ("Humanitarian Law Project II"), vacated by, Humanitarian Law Project v. United States Department of State, 393 F.3d 902 (9th Cir.2004); Humanitarian Law Project v. Reno, 205 F.3d 1130 (9th Cir. 2000) ("Humanitarian Law Project I"), cert. denied, 532 U.S. 904 (2001); Humanitarian Law Project v. Gonzales, 380 F. Supp. 2d 1134 (C.D. Cal. 2005) ("Humanitarian Law Project III"); United States v. Marzook, 383 F. Supp. 2d 1056 (N.D. Ill. 2005); Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571 (E.D.N.Y. 2005).   The Second Circuit has not yet addressed this issue, but the Ninth Circuit and the district court in the Humanitarian Law Project litigation have addressed several iterations of First and Fifth Amendment challenges to the mens rea required by 18 U.S.C. § 2339B.

In its first consideration of the mens rea requirement for 18 U.S.C. § 2339B, the Ninth Circuit rejected a First Amendment challenge and explained that the statute survives even

without a requirement that a person intended to further the unlawful ends of the organization because the statute prohibits the conduct of providing material support and does not prohibit association or advocacy on behalf of foreign terrorist organizations.  See Humanitarian Law Project I, 205 F.3d at 1134-35; see also United States v. Hammoud, 381 F.3d 316, 329 (4th Cir. 2004).

The Ninth Circuit subsequently addressed a Fifth Amendment challenge to 18 U.S.C. § 2339B in which plaintiffs contended that the statute violates the Fifth Amendment's due process requirement that the government prove "personal guilt," as explained by the Supreme Court's decision in Scales v. United States, 367 U.S. 203, 224-28, 81 S. Ct. 1469, 6 L. Ed. 2d 782 (1961). See Humanitarian Law Project II, 352 F.3d at 392.[4]  In Scales, the Supreme Court addressed a Fifth Amendment challenge to a conviction under the "membership clause" of the Smith Act, which criminalized membership in Communist organizations that advocated the overthrow of the government by force or violence.  See Scales, 367 U.S. at 205; 18 U.S.C. § 2385.  The statutory provision at issue in Scales provided in relevant part that: "'[w]hoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof'" is guilty of a crime.  Scales, 367 U.S. at 206, n.1 (quoting 18 U.S.C. § 2385) (emphasis in Scales).  The defendant claimed that that clause violated due process by imposing guilt by association.  The Supreme Court disagreed, but only because the government was required to prove more than the defendant's mere membership; it

---

[4] Although Humanitarian Law Project II  has been vacated by the Ninth Circuit in light of Congress's subsequent amendment to section 2339B, see Humanitarian Law Project v. United States Department of State, 393 F.3d 902 (9th Cir.2004), its analysis was not questioned; in fact, Congress amended the statute to incorporate the mens rea requirement imposed by the Ninth Circuit in Humanitarian Law Project II.   See Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (West 2004) (codified at 18 U.S.C. § 2339B(a)).

had to prove that the defendant "knew that the organization engages in criminal advocacy, and

that it was his purpose to further that criminal advocacy."  See Scales, 367 U.S. at 226 n. 18,

228; see also Humanitarian Law Project II, 352 F.3d at 395.   In response to Scales' due process

claim, the Supreme Court explained:

> In our jurisprudence guilt is personal, and when the imposition of punishment on
> a status or on conduct can only be justified by reference to the relationship of that
> status or conduct to other concededly criminal activity (here advocacy of violent
> overthrow), that relationship must be sufficiently substantial to satisfy the concept
> of personal guilt in order to withstand attack under the Due Process Clause of the
> Fifth Amendment.

Scales, 367 U.S. at 224-25.  Evaluating the constitutionality of the statute, the Court stated that

its inquiry was properly directed to an "analysis of the relationship between the fact of

membership and the underlying substantive illegal conduct, in order to determine whether that

relationship is indeed too tenuous to permit its use as the basis of criminal liability."  Scales, 367

U.S. at 226.

The Ninth Circuit applied this test in analyzing whether section 2339B, "a statute that

presumes that a person acts with guilty intent whenever that person provides material support to

a designated organization," suffered from the due process concern identified in Scales.  See

Humanitarian Law Project II, 352 F.3d at 396.  The Ninth Circuit noted membership is not

prohibited; rather, "[t]he act or conduct that the statute proscribes is the act or conduct of a

person providing 'material support' to a designated organization that engages in both

humanitarian and unlawful activities."  Id. at 396-97 (emphasis in original).  Humanitarian Law

Project II rejected the government's interpretation of the statute which would have permitted

convictions without proof that a person knew that the organization had been a designated foreign

terrorist organization or knew of the activities leading to that designation.  Id. at 397.  The Ninth

Circuit explained that to permit conviction where a person acted "with innocent intent" – defined

47

in the context of section 2339B as acting "without critical information about the relevant organization" – would contravene the requirement of personal guilt.  Id.

In light of the potential for serious constitutional concerns, the Ninth Circuit considered whether the plain text of section 2339B could be fairly construed to meet the test of due process. Id. (citing United States v. X-Citement Video, 513 U.S. 64, 69, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994).  Applying the principle that a statute is to be construed against the background presumption in favor of a scienter requirement that "appl[ies] to each of the statutory elements that criminalize otherwise innocent conduct," see X-Citement Video, Inc., 513 U.S. at 72 (citing Staples v. United States, 511 U.S. 600, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994) and Morissette v. United States, 342 U.S. 246, 72 S. Ct. 240, 96 L. Ed. 288 (1952)), and in light of the due process concern of personal guilt, the Ninth Circuit construed section 2339B "to require proof of knowledge, either of an organization's designation [as a foreign terrorist organization] or of the unlawful activities that caused it to be so designated."  Humanitarian Law Project II, 352 F.3d at 402-03.  Following the Ninth Circuit's decision, Congress amended section 2339B and clarified the mens rea requirement.  As amended, section 2339B now explicitly provides that: "[t]o violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . . that the organization has engaged or engages in terrorist activity . . . or that the organization has engaged or engages in terrorism . . . ."  18 U.S.C. § 2339B(a)(1).

Although Humanitarian Law Project II did not explicitly state that further proof of an intent to aid the unlawful activities of the terrorist organization was not necessary to satisfy the due process requirement of personal guilt, its analysis of Scales and application of the Scales test to section 2339B suggests an implicit conclusion that no such intent is necessary.  See generally, Humanitarian Law Project II, 352 F.3d at 395-97; see also id. at 396-97 (noting that what is

48

criminalized by the statute is the "provision of 'material support' to a designated organization that engages in both humanitarian and unlawful activities"). On a subsequent motion in the continued litigation, the same plaintiffs specifically urged that an additional intent to further the unlawful activities of the foreign terrorist organization was necessary to avoid Fifth Amendment due process concerns. See Humanitarian Law Project v. Gonzales, 380 F.Supp.2d 1134, 1142 (C.D. Cal. 2005) ("Humanitarian Law Project III").

The district court in the Humanitarian Law Project litigation again considered Scales, but reasoned that Scales "was concerned with criminalizing associational membership in violation of the First Amendment." Humanitarian Law Project III, 380 F. Supp. 2d at 1143. Because section 2339B does not criminalize mere membership or association with foreign terrorist organizations, the court rejected the plaintiff's new constitutional challenge. See id.; see also United States v. Marzook, 383 F. Supp. 2d 1056, 1060 (N.D. Ill. 2005); Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 587 (E.D.N.Y. 2005).

This Court agrees that the statute's focus on conduct rather than association or membership solves First Amendment concerns and the same distinction is sufficient to satisfy the due process requirement of personal guilt. As the Ninth Circuit explained in Humanitarian Law Project II, the concern driving the enactment of section 2339B was the threat posed by international terrorism. See Humanitarian Law Project II, 352 F.3d at 396-97. At the time section 2339B was enacted, section 2339A already prohibited the act of providing material support or resources to further illegal terrorist activities. See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120005(a), 108 Stat. 2022 (Sept. 13, 1994). However, Congress was concerned that terrorist organizations could raise funds "under the cloak of a humanitarian or charitable exercise," and thus sought to pass legislation that would

"severely restrict the ability of terrorist organizations to raise much needed funds for their

terrorist acts within the United States."  H.R. Rep. 104-383, at 43 (1995).  Section 2339B –

enacted two years after section 2339A – plainly excludes the explicit <u>mens</u> <u>rea</u> requirement to

further illegal activities, and the legislative history indicates that this exclusion was purposeful

and was designed to "close a loophole left by § 2339A."  <u>Humanitarian Law Project v. Gonzales</u>,

380 F.Supp.2d at 1146; <u>see also</u> <u>Marzook</u>, 383 F.Supp.2d at 1070-71 ("the additional

requirement finds no basis in the statute's language," and "clashes with Congress's intent").

      In enacting section 2339B, Congress found that "foreign organizations that engage in

terrorist activity are so tainted by their criminal conduct that any contribution to such an

organization facilitates that conduct."  <u>See</u> AEDPA § 301(a)(7), 110 Stat.1247 (1996).  The

purpose section 2339B is intended to advance is "to provide the Federal Government the fullest

possible basis, consistent with the Constitution, to prevent persons within the United States, or

subject to the jurisdiction of the United States, from providing material support or resources to

foreign organizations that engage in terrorist activities."  <u>Id.</u> at § 301(b), 110 Stat 1214, 1247.

By criminalizing the conduct of providing material support to any organization that is properly

designated a foreign terrorist organization, and not the mere association with those organizations,

the statute properly focuses on the personal action of the individual.  Because the statute requires

that the person providing material support do so with knowledge that the organization has been

designated a foreign terrorist organization, or knowledge of those unlawful terrorist acts which

justify such designation, the due process requirement of personal guilt is satisfied.  <u>See</u> <u>Scales</u>,

367 U.S. at 226-27; <u>See</u> <u>Humanitarian Law Project II</u>, 352 F.3d at 396.

      Moreover, nothing in the Supreme Court's cases instructing courts to construe a statute as

imposing a scienter requirement applicable to each element that criminalizes otherwise innocent

conduct warrants a judicial interpretation that would contravene the Congress's evident intent to dispense with the requested intent requirement.  See X-Citement Video, Inc., 513 U.S. at 72; see also Humanitarian Law Project III, 380 F. Supp. 2d at 1145-46.   The Al-Arian court's conclusion to the contrary is not persuasive.

In its first opinion addressing this issue, the Al-Arian court expressed concern that Humanitarian Law Project II solved only part of a Fifth Amendment problem because it "implies only a mens rea requirement to the FTO element of Section 2339B(a)(1) and not to the material support element."  Al-Arian, 308 F.Supp.2d at 1337-38.  Al-Arian reasoned that the statute should be read so that the word "knowingly" modified "material support" in order to avoid criminalizing the seemingly innocent activities of giving some minor form of assistance to an individual who is a member of a terrorist organization.  See id.  The court concluded that the government must prove that the defendant knew: "(a) the organization was a [foreign terrorist organization] or had committed unlawful activities that caused it to be so designated; and (b) what he was furnishing was "'material support.'"  Id. at 1338-39.  The court further explained that to meet the second requirement "the government must show more than a defendant knew something was within a category of 'material support.'"  Id. at 1339.  To meet that requirement, "the government must show that the defendant knew (had a specific intent) that the support would further the illegal activities of a [foreign terrorist organization]."  Id.  In denying the government's motion for reconsideration, the Al-Arian court reformulated this requirement as "knowledge . . . that the recipient could or would utilize the support to further the illegal activities of the entity."  See United States v. Al-Arian, 329 F. Supp. 2d 1294, 1298 (M.D. Fla. 2004).

This additional requirement of an intent to further the unlawful activities of the foreign terrorist organization is not consistent with the statute, however, and is not necessary to avoid the criminalization of seemingly innocent minor assistance to individuals who happen to be members of foreign terrorist organizations.  The statutory definition of "material support and resources" limits what constitutes assistance sufficiently blameworthy to attach criminal liability, see 18 U.S.C. § 2339A(b), and courts have not hesitated to dismiss charges founded upon parts of that definition that are constitutionally infirm.  See e.g., Humanitarian Law Project II, 352 F.3d at 403; United States v. Sattar, 272 F. Supp. 2d 348, 359 (S.D.N.Y. 2003).

The Al-Arian court's concern with criminalizing the provision of support to an individual who happens to be a member of a foreign terrorist organization also does not warrant grafting on the additional requirement of an intent to further the illegal activities of the organization.  This specific concern was raised by Paracha in his motion to dismiss the indictment, and as explained above, to avoid any question of vagueness, this Court concluded – consistent with the plain text of section 2339B – that the government must prove that defendant "knowingly provide[d] material support or resources to a foreign terrorist organization," see 18 U.S.C. § 2339B(a) (emphasis added), and not merely to individuals who happen to be members of that organization.

In sum, this Court agrees with the weight of existing judicial authority that requiring the government to prove defendant acted with the intent to further the unlawful activities of the foreign terrorist organization is not necessary to avoid constitutional questions and would contravene the plain text of section 2339B.

C.     **Knowledge That What the Defendant Provides Is, In Fact, "Material Support" Is Not Required**

Paracha also requests that the government be required to prove that he knew that what he was providing was in fact material support as defined by 18 U.S.C. § 2339A(b).  This request is

also denied as unsupported by the statute or case law.  No court – including the <u>Al-Arian</u> court – has imposed such a specific intent requirement on the statute.  In its second opinion, the <u>Al-Arian</u> court clarified that the government would not be required to prove knowledge "that what [the defendants] actually were providing was within the list of items defined as 'material support' in Section 2339A."  <u>See</u> <u>Al-Arian</u>, 329 F. Supp.2d at 1298, n.10.  Such a requirement would be untenable as it is in tension with the well-settled principle that "[i]gnorance of the law is not a defense."  <u>Id.</u>  Unless Congress specifically indicates otherwise – and it has not done so here – the government need not prove that a defendant is aware of the details of the specific law he is charged with violating; rather, the government can prove a violation of the law by demonstrating that the defendant acted with "knowledge of the facts that constitute the offense."  <u>Bryan v. United States</u>, 524 U.S. 184, 193, 118 S. Ct. 1939, 141 L. Ed. 2d 197 (1998); <u>see</u> <u>also</u> <u>United States v. George</u>, 386 F.3d 383, 390 (2d Cir. 2004).

**D.     Instruction on the <u>Mens</u> <u>Rea</u> Requirement**

Because it is neither required by the constitution nor consistent with the statutory text, the jury will not be instructed that the government must prove that Paracha knew that what he was providing was in fact material support, or that he intended to further the unlawful activities of the al Qaeda entity.  The jury will, however, be instructed that the government must prove that Paracha provided material support knowing that this support would or could be used to further the activities of the organization, and not merely the personal interests of its members, so as to avoid any vagueness problem as raised by Paracha in his pretrial motion to dismiss the indictment.  Specifically, the jury will be instructed as follows in respect to the <u>mens</u> <u>rea</u> requirement of section 2339B:

The third element that you must find beyond a reasonable doubt is that, in providing material support or resources to a designated foreign terrorist organization, the defendant did so "knowingly."  To prove this, the government must prove beyond a reasonable doubt, first, that the defendant acted voluntarily and intentionally and not because of mistake or accident.   Second, the government must prove that the defendant knew that al Qaeda had been designated by the Secretary of State as a "foreign terrorist organization" or that he knew that it had conducted or engaged in "terrorist activity."  "Terrorist activity" includes the following:
. . .
It is sufficient for the government to prove beyond a reasonable doubt either that the defendant had specific knowledge that the organization to which he provided support had been designated a foreign terrorist organization by the United States government or that the defendant had specific knowledge that the organization to which he provided support engaged or engages in terrorist acts of the type I have previously enumerated.  It is not necessary to find both, however, you must be unanimous as to what you do find.
Third, the government must prove beyond a reasonable doubt that in providing material support or resources, that the defendant did so knowing that the material support or resources could or would be utilized to further the activities of the al Qaeda entity and not just the personal interests of al Qaeda's individual members.

## IV.     Conclusion

The significance of the interests of Paracha and the government in this action cannot be gainsaid.  Although this Court will not require the government to produce witnesses where doing so threatens our national security, neither can it permit a trial to go forward where doing so would deprive Paracha of his right to present a meaningful defense.  In the unique circumstances of this case, the availability of the exculpatory statements made by Khan and al Baluchi has made it possible to craft what the Court believes constitutes an effective and viable alternative to their live testimony or videotaped deposition testimony.

As for the government's proposed expert, while the government may present expert testimony to explain to the jury the origins and structure of al Qaeda, it may not use an expert to

summarize factual evidence for the jury nor may it present expert testimony aimed at guiding the jury's determination of the credibility of fact witnesses.

Finally, although the government need not prove that Paracha intended to further the unlawful activities of al Qaeda to sustain a conviction of the counts charging violations of 18 U.S.C. § 2339B, it must prove that Paracha acted knowing that what he was providing would or could further the interests of al Qaeda as an organization and not simply the personal interests of its individual members.

Dated:  New York, New York
        January 3, 2006

Sidney H. Stein, U.S.D.J.

55